IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MISSOURI CORRECTIONS OFFICERS ASSOCIATION, INC., and CHARLES DAVIS II, ROBERT BRODY, KIMBERLEY FERGUSON, and PAUL THOMAS, as class representatives, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MISSOURI DEPARTMENT OF CORRECTIONS, JEREMIAH NIXON, CHRIS KOSTER, GEORGE LOMBARDI, and TOM CLEMENTS, | ) ) ) ) ) |
| Defendants. | ) |

Case No. 10-4168-CV-NKL

**ORDER**

Before the Court is the Motion to Dismiss [Doc. # 14] filed by Defendants Missouri Department of Corrections ("DOC"), Jeremiah Nixon, Chris Koster, George Lombardi, and Tom Clements. For the following reasons, the Court grants the motion.

**I.     Background**

Plaintiffs Missouri Corrections Officers Association, Inc., and putative class representatives, Charles Davis II, Robert Brody, Kimberley Ferguson, and Paul Thomas, bring this suit under 42 U.S.C. § 1983. Purporting to seek only prospective injunctive relief, Plaintiffs assert that Defendants Missouri DOC, Governor Nixon, Attorney General Koster, DOC Director Lombardi, and Adult Institutions Director Clements are violating the U.S.

Constitution's Contracts Clause and the Due Process Clause of its Fourteenth Amendment. The following facts are taken from Plaintiffs' Amended Complaint and are assumed true for purposes of this motion to dismiss.

Missouri corrections officers frequently work in excess of their assigned daily shifts. According to the DOC Compensatory Time Policy – found in the Department's Manual – when certain corrections officers have worked in excess of their assigned daily shifts, but have not yet worked more than 40 hours in a particular work week, they earn "state compensatory time." [Doc. # 1, Ex. B at II.N.2.] Corrections officers have been able to use state compensatory time to obtain either additional pay or additional leave. Until March 2009, the DOC's Policy also provided:

> Employees may use accrued balances of federal overtime, state compensatory time, or holiday time as compensatory leave when both the employee and the supervisor agree on such use. Consequently, the chief administrative officer/designee may not require these employees to use federal overtime, state compensatory time, or holiday time as compensatory leave.

*Id.* at III.H.2b.

In 2007, the Missouri DOC entered into a collective bargaining agreement ("CBA") with corrections officers that guarantees corrections officers the right to 14 days' notice before the DOC schedules a "mandatory compensatory time reduction" – a term which the CBA itself does not define. [Doc. # 1, Ex. A at 11.] The CBA also provides:

ARTICLE 2: MANAGEMENT RIGHTS

Section 2.1
It is understood and agreed that the Employer possesses the sole right and authority to operate and direct its employees and its various divisions,

agencies, and operations in all aspects including, but not necessarily limited to, all rights and authority exercised by the Employer prior to the execution of this Agreement, except as modified by the terms of this Agreement.

Section 2.2
These rights include, but are not limited to:
. . .
• The right to hire, assign, reassign, transfer, promote and to determine hours of work and shifts and assign overtime;
• The right to suspend, demote and dismiss in accordance with applicable statutes;
• The right to furlough and layoff employees.
. . .

*Id.* at 4.

In 2009, the Missouri General Assembly reduced appropriations for corrections officers' overtime pay from $10 million to $6.2 million. In 2010, the General Assembly reduced appropriations for overtime pay even more, to $5.1 million.

As a result of the budget crunch, Defendants amended Part III.H.2.b of the DOC Compensatory Time Policy as follows:

Employees may use accrued balances of federal overtime, state compensatory time, or holiday time as compensatory leave when both the employee and the supervisor agree on such use[;] however, III.H.2.a is also applicable to state compensatory time usage.

The chief administrative officer/designee may not require these employees to use federal overtime or holiday time as compensatory leave.

[Doc. # 1, Ex. F at III.H.2.b.] Thus, the DOC Policy now excludes state compensatory time from the categories of time which the DOC may not require employees to use as compensatory leave. *Id.* In other words, the DOC Policy now allows management to require employees to use state compensatory time as compensatory leave rather than as additional

pay. Additionally, the Policy now provides that "III.H.2.a is also applicable to state compensatory time usage." *Id.* Part III.H.2.a of the Compensatory Time Policy allows management to adjust employees' work schedules during the work week. [Doc. # 1, Ex. F at III.H.2.a.] Applied to state compensatory time "usage" – as opposed to "accrual" – the Policy change would appear to allow DOC management to require employees to use their state compensatory time as compensatory leave the same week in which it was earned.

Plaintiffs assert that such a practice violates the CBA's provision granting corrections officers the right to 14 days' notice before the DOC schedules a "mandatory compensatory time reduction." In Count I of their Amended Complaint, Plaintiffs assert a claim under Section 1983 for the violation of the Contracts Clause of the U.S. Constitution. According to the Amended Complaint, by interfering with the rights and expectations of the employees as to their salary and time off, the two Missouri appropriations statutes, "as implemented by Defendants," substantially impair Plaintiffs' employment contract. [Doc. # 26, Ex. 1 at ¶ 72.] Under Count II, Plaintiffs assert a violation of the Due Process Clause of the Fourteenth Amendment under the theory that they had a constitutionally protected property interest in state compensatory time and that the legislature's objective in passing the appropriations statutes was not rationally related to a legitimate state purpose. *Id.* at ¶¶ 82-83.

Defendants now move to dismiss this action with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants argue that (1) DOC policies and practices have not impaired the CBA; (2) even if there is substantial impairment of the CBA, no legislative action has itself impaired the contract, and thus Plaintiffs have confused a breach

of contract claim with a Contracts Clause claim; (3) Plaintiffs have also failed to state a claim under the Due Process Clause; and (4) the Eleventh Amendment bars any recovery beyond prospective injunctive relief – which would not include crediting Plaintiffs with compensatory time convertible to additional pay.

**II.      Discussion**

   **A.      Whether Plaintiffs have Stated a Claim under the Contracts Clause**

The Contracts Clause of the U.S. Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." Art. I, § 10, cl. 1. In considering Contracts Clause claims, courts look first to whether a state law has operated to substantially impair a contractual relationship. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). To allege a Contracts Clause claim, Plaintiffs must plead: (1) a contractual relationship; (2) a change in law which impairs that contractual relationship; and (3) the impairment is substantial. *See General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). If these components are satisfied, courts then consider whether the impairment is nevertheless justified as reasonable and necessary in serving an important public interest. *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 29 (1977).

Here, Plaintiffs have properly alleged a contractual relationship between themselves and the Missouri DOC in the form of the CBA. The question before the Court is whether a change in the law substantially impaired the CBA.

Citing a case decided in 1913, Plaintiffs argue that the Contracts Clause reaches "every form in which the legislative power of a state is exerted, whether it be a constitution,

5

a constitutional amendment, an enactment of the legislature, a by-law or ordinance of a municipal corporation, or a regulation or order of some other instrumentality of the state exercising delegated legislative authority." *Ross v. Oregon*, 227 U.S. 150, 162-63 (1913) (citations omitted). Even under this broad definition of "legislative power," the Policy found in the Department Manual does not qualify as the exertion of Missouri's legislative power. The DOC Policy is not legally binding, in contrast to the other delegated forms of legislative power enumerated in *Ross*. The only exertions of legislative power at issue in this case are Missouri's two appropriations statutes, which together operated to reduce funding for corrections officers' overtime pay from $10 million to $5.1 million.

Having identified the relevant change in the law, the remaining question is whether those 2009 and 2010 statutes themselves substantially impaired the CBA. In answering this question in the affirmative, Plaintiffs assert that "but for the appropriation bills, the collective bargaining agreement would not have been impaired." [Doc. # 36 at 8.] However, the Court notes that Plaintiffs provide very little authority for their "but for" theory of Contracts Clause causation. While Plaintiffs cite a handful of cases in which appropriations bills contained specific provisions directly mandating contractual impairments, they cite only one case in which a court applied a "but for" test to determine whether mere budget reduction legislation "prompted" the impairment of a contract through subsequent discretionary action undertaken within the executive branch. *Arriaga v. Members of Bd. of Regents*, 825 F. Supp. 1, 5 (D. Mass. 1992).

6

In *Arriaga*, members of the Massachusetts Board of Regents of Higher Education increased the tuition of non-resident students pursuant to a budget bill passed by the state's legislature, and students challenged the increase as a violation of the Contracts Clause. *Id.* at 3. The district court denied Massachusetts' motion to dismiss, reasoning that "the legislation at issue not only motivated the Regents' action, but was the event which gave effect to the Regents' vote to raise non-resident tuition." *Id.* *Arriaga*, in turn, cited only two *Lochner*-era cases supporting its expansive view of causation under the Contracts Clause. *Id.* at 4-5 (citing *Cross Lake Shooting & Fishing Club v. Louisiana*, 224 U.S. 632 (1912); *Carondelet Canal & Navigation Co. v. Louisiana*, 233 U.S. 362 (1914)).

First, *Arriaga* noted that in *Cross Lake* Justice Van Devanter referred to a contractual impairment that "results from" the exertion of legislative power. *Id.* at 4 (quoting *Cross Lake*, 224 U.S. at 638). However, taken in context, *Cross Lake* clearly did not establish a "but for" causation test under the Contracts Clause:

> [The Contracts C]lause, as its terms disclose, is not directed against all impairment of contract obligations, but only against such as results from a subsequent exertion of the legislative power of the state. It does not reach mere errors committed by a state court when passing upon the validity or effect of a contract under the laws in existence when it was made. And so, while such errors may oporate [sic] to impair the obligation of the contract, they do not give rise to a Federal question. But when the state court, either expressly or by necessary implication, gives effect to a subsequent law of the state whereby the obligation of the contract is alleged to be impaired, a Federal question is presented. . . . But if there be no such law, or if no effect be given to it by the state court, we cannot take jurisdiction . . . .

*Cross Lake*, 224 U.S. at 638-39. In other words, a contractual impairment "results from" the exertion of legislative power where the impairment is the direct legal result of the legislation

7

in question – as the statute itself is interpreted in state court – not whatever real-world vicissitudes might follow a legislative enactment.

Second, *Arriaga* explained that in *Carondelet*, Justice McKenna "indicated that it was 'the effect of the enactment' which was controlling in determining whether the Contracts Clause was implicated." *Arriaga*, 825 F. Supp. at 5 (quoting *Carondelet*, 233 U.S. at 375). Once again, taken in its full context, *Carondelet* clearly did not establish a "but for" test:

> The question, then, is whether the act of 1906, appointing the board of control and investing it with powers, was an act which impaired the obligation of the contract; and in the solution of the question we must assume that the act of 1858 constituted a contract between the state and the canal company. . . . Nor need bad motives be imputed to the legislature. It is not the motive which caused the enactment of the law which is of account, but the effect of the enactment, impairing the rights resting in the contract. And this, we think, was the effect of the act of 1906. . . . [T]he board exercised the power given it; and to remove the impediments to the exercise of the power, "all laws and parts of laws in conflict with" the act of 1906, which conferred the power, were repealed. The repeal of a law which constitutes a contract is an impairment of its obligation.

233 U.S. at 376-78. Thus, closer inspection of *Carondelet* reveals that the Supreme Court referred only to the legislation's binding legal "effect," as contrasted with the legislature's motives. *Id.* at 376. In *Carondelet*, the legislation (1) delegated to the board quasi-legislative power, and (2) repealed all laws in conflict with it. *Id* at 377-78. Therefore, the legal effect of the legislation itself was to impair a contractual obligation that Louisiana had assumed through legislation: "The repeal of a law which constitutes a contract is an impairment of its obligation." *Id.*

The Supreme Court in *Carondelet* also articulated the purpose of the Contracts Clause: "The prohibition is directed against the exertions of sovereignty which the citizens, unless protected by the organic law, would be impotent to resist . . . ." *Id.* at 378. Indeed, the Seventh Circuit has more recently explained:

> Mere refusal to perform a contract by a state does not raise a constitutional issue . . . . If the action of the state does not preclude a damage remedy the contract has been breached and the non-breaching party can be made whole. If this happens there has been no law impairing the obligation of the contract.

*E & E Hauling, Inc. v. Forest Pres. Dist. of Du Page County, Ill.*, 613 F.2d 675, 678-79 (7th Cir. 1980) (citing *Hays v. Port of Seattle*, 251 U.S. 233, 237 (1920)).

The Eighth Circuit has expressed a similar view as *E & E Hauling*. *See Jackson Sawmill Co. v. United States*, 580 F.2d 302, 312 (8th Cir. 1978), *cert. denied*, 439 U.S. 1070 (1979). In *Jackson Sawmill*, the Eighth Circuit rejected a Contracts Clause claim because no legislative action mandated the impairment of the plaintiffs' contract rights. There, holders of municipal bonds issued to finance a bridge brought suit against the City of East St. Louis's construction of a competing bridge because it would reduce the tolls collected by the first bridge used to pay the principal and interest on their bonds. *Id.* at 304-05. In other words, the plaintiffs in *Jackson Sawmill* argued that their contracts would not have been impaired "but for" the subsequent exercise of delegated legislative power. In response, the Eighth Circuit wrote:

> In the *United States Trust Co.* case, the Supreme Court found an unconstitutional impairment of contract by the states of New Jersey and New York. The two states had passed similar statutes that repealed prior contractual obligations undertaken by the states. In the present case, in contrast, no

9

>attempt was made to use the law, federal or state, to repudiate a contractual obligation. Assuming the obligation did exist, all defendants were open to a suit for breach of contract. In short, appellants have confused impairment of performance of a contract with impairment of the obligation of the contract. The Constitution does not provide a federal action for simple breach of contract.

*Id.* at 312.

Therefore, the Court finds not only that *Arriaga* – relied on so heavily by Plaintiffs – is unpersuasive, but also that the Massachusetts case runs counter to Eighth Circuit precedent. As in *Jackson Sawmill*, Plaintiffs have confused failure to perform a contract with the legal impairment of a contractual obligation.

Finally, it should be noted that Plaintiffs have recently suggested that the Court might prefer to follow *TM Park Avenue Associates v. Pataki*, 214 F.3d 344 (2d Cir. 2000), to find that Plaintiffs' federal claims are not yet ripe. [Doc. # 46 at 1.] This Second Circuit case does not persuade the Court that it should deny Defendants' Motion to Dismiss. In *TM Park Avenue Associates*, it was the defendant rather than the plaintiffs who raised the ripeness challenge. 214 F.3d at 347. If the Plaintiffs here brought their federal action before it became ripe, that is hardly a reason to deny the Motion to Dismiss. In fact, *TM Park Avenue Associates* quoted the Eighth Circuit's *Jackson Sawmill*: "[A]n individual breach of contract . . . does not reach constitutional dimensions and create a cause of action based on the contracts clause." *Id.* at 348 (quoting *Jackson Sawmill*, 580 F.2d at 311-12). The Second Circuit also cited *E & E Hauling*: "Mere refusal to perform a contract by a state does not raise a constitutional issue." *Id.* (quoting *E & E Hauling*, 613 F.2d at 678). The Court agrees

that Plaintiffs here have failed to raise a constitutional issue with respect to the Contracts Clause.

Here, Plaintiffs have alleged only that Missouri's two appropriations statutes reduced funding for corrections officers' overtime pay from $10 million to $5.1 million. Plaintiffs do not allege that the statutes themselves had the legal effect of impairing the CBA. Instead, Plaintiffs assert that "but for the appropriation bills, the collective bargaining agreement would not have been impaired." [Doc. # 36 at 8.] Although the DOC's alleged practices – permitted by the 2009 Policy change – may violate the CBA, Missouri has not used its legislative power to repudiate a contractual obligation, and legislation has not foreclosed a simple breach of contract remedy.

For the reasons stated above, Plaintiffs have not alleged that a change in the law of Missouri has substantially impaired the CBA. Therefore, Plaintiffs have failed to state a claim for which relief may be granted under the Contracts Clause as enforced through Section 1983.

**B.     Whether Plaintiffs have Stated a Claim under the Due Process Clause**

Plaintiffs' Amended Complaint also asserts a violation of the Due Process Clause of the Fourteenth Amendment under the theory that Plaintiffs had a constitutionally protected property interest in state compensatory time and that the legislature's objective in passing the appropriations statutes was not rationally related to a legitimate state purpose.

The Court finds persuasive the Seventh Circuit's reasoning in an analogous case, *Brown v. Brienen*, which held that the Due Process Clause does not require more than a post-

deprivation state lawsuit for a breach of contract involving a denial of accrued compensatory time. 722 F.2d 360, 367 (7th Cir. 1983). There, Justice Posner applied the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), after assuming arguendo that the alleged breach of contract deprived the plaintiffs of a property interest under the Fourteenth Amendment. *Id.* at 365. Under *Mathews*, courts consider three factors to decide whether there has been a denial of procedural due process: (1) the importance of the interest of which the plaintiff has been deprived; (2) the risk that the deprivation was erroneous because a particular procedural safeguard was not provided, and (3) the burden to the state of providing that procedure. 424 U.S. at 335. Judge Posner summarized his *Mathews* analysis as follows:

> [T]he "property" of which the plaintiffs were deprived, if property it is in a Fourteenth Amendment sense (which as we have said we doubt), is far down on the scale of Fourteenth Amendment interests. In addition, the deprivation was merely a postponement. Indeed, since the plaintiffs' loss was of a kind readily compensable in monetary terms, it may even be doubted whether any deprivation in the constitutional sense has yet occurred, or will occur unless and until the state courts turn down a meritorious contract claim. And the additional procedural safeguard that the plaintiffs seek, a pre-deprivation administrative hearing, would have been burdensome to the local officials who would have had to conduct it but of little utility to the plaintiffs in inducing the [defendant] to change his mind.

722 F.2d at 366.

Here, as well, Plaintiffs' loss was of a kind readily compensable in monetary terms. Even assuming that a deprivation under the Fourteenth Amendment has occurred in the absence of a state court rejecting a meritorious contract claim – especially in a class action suit such as this – the burden of providing a pre-deprivation administrative hearing overwhelms the risk that the deprivation was erroneous because that procedural safeguard

12

was not provided.  To resolve the claims of this entire class of corrections officers, a state court breach of contract action is the proper procedure.  *See Ramsey v. Bd. of Educ. of Whitley County, Ky.*, 844 F.2d 1268, 1274-75 (6th Cir. 1988) (teacher's claim that she was deprived of property without due process when school board reduced number of accumulated sick leave days "can be and should be redressed by a state breach of contract action and not by a federal action under section 1983").  As Judge Posner noted, it is doubtful that the Fourteenth Amendment was intended to allow every person with a breach of contract claim against a state to bring that claim in federal court.  *Brown*, 722 F.2d at 364 (citing *Green v. Bd. of School Comm'rs*, 716 F.2d 1191, 1192 (7th Cir. 1983)).

Finally, Plaintiffs argue that a state court breach of contract action may not be available to them because of sovereign immunity.  However, Defendants concede that it is well settled in Missouri that "when the State enters into a validly authorized contract, it lays aside whatever privilege of sovereign immunity it otherwise possesses and binds itself to performance, just as any private citizen would do by so contracting."  *V. S. DiCarlo Constr. Co. v. State*, 485 S.W.2d 52, 54 (Mo. 1972) (en banc).  Defendants further concede that they entered into a binding contract with the corrections officers, thereby "disclaim[ing] any right to assert the sovereign immunity from damages defenses raised pro forma in their answer" to the state court petition which Plaintiffs previously filed but voluntarily dismissed before filing this federal action.  [Doc. # 48 at 4.]

For the reasons stated above, Plaintiffs' Due Process Clause theory must also fail. Because Plaintiffs have failed to state a claim for which relief may be granted, it is unnecessary for the Court to address Defendants' Eleventh Amendment argument.

### III. Conclusion

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss [Doc. # 14] is GRANTED.

                                                s/ Nanette K. Laughrey
                                                NANETTE K. LAUGHREY
                                                United States District Judge

Dated: May 23, 2011
Jefferson City, Missouri